UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CANDY FIGUEROA<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL SECURITY<br><br>Defendant. | Civil Action No. 12-CV-4033 (SDW)<br><br><br><br>OPINION<br><br><br>July 9, 2013 |

**Wigenton, District Judge.**

Before the Court is plaintiff Candy Figueroa's ("Figueroa" or "Plaintiff") appeal on the final administrative decision of the Commissioner of Social Security ("Commissioner"), with respect to Administrative Law Judge Michael L. Lissek's ("ALJ") denial of Plaintiff's claim for Supplemental Security Income ("SSI") under Title II of the Social Security Act (the "Act"). The Plaintiff, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeks review of a determination of the Commissioner, which denied Plaintiff's application for SSI under the Act.

This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Venue is proper under 28 U.S.C. § 1391(b).

This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.

For the reasons set forth herein, this Court **AFFIRMS** the ALJ's decision dated April 13, 2011 ("ALJ's Decision").

**BACKGROUND AND PROCEDURAL HISTORY**

*a. Education and Work History*

Figueroa was born on March 24, 1964 and lives in Perth Amboy, New Jersey. (R. at 25.) Figueroa has a high school education and has completed special job training as a clerk typist at the Middlesex County College. (R. at 58.)

Figueroa was employed as a cashier, and previously held various temporary jobs. (R. at 54.) According to Figueroa, she stopped working because she was moving around and had no way of getting to and from work. (R. at 53.)

*b. Medical History and Treatment*

On December 23, 2005, Figueroa filed an application for SSI benefits (R. at 43-45), alleging that ever since 1996, she has been unable to function, has been suicidal, and reported having mood swings. (R. at 53, 189.) Figueroa stated that her depression and anxiety have limited her ability to work starting August 6, 2002. (R. at 53, 189.) She reported seeing therapist Dr. Edna Barry ("Dr. Barry"), since August 2002 until December 2005, when Dr. Barry retired. (R. at 78.) On October 17, 2004, Figueroa was admitted to Robert Wood Johnson University Hospital for a psychiatric evaluation and was found to be alert, awake, and in mild emotional distress. (R. at 105.)

In May 2006, Figueroa started seeing a new therapist, Dr. Vajramala P. Bhatia ("Dr. Bhatia"). (R. at 105.) During her switch to Dr. Bhatia, it was reported that Figueroa was not on medication and was considered stabilized. (R. at 140.) However, it was also noted that Figueroa "has a history of depression, anxiety, mood swings, and substance abuse." (R. at 140.) On

August 15, 2006, Figueroa reported no change in her physical or mental condition and no new illnesses, injuries, or conditions, and that she had not seen a doctor for her illnesses, injuries, or conditions or for emotional or mental problems that limit her ability to work. (R. at 60-61.)

Social Security Administration forms dated November 29, 2006 reflect that Figueroa reported the following at that time: that while at times she goes out, at other times she stays in her room depressed, watching television, and not speaking with anyone; and she was restless and unable to socialize with others without crying or having mood swings. (R. at 80, 81.) Figueroa does not cook much anymore, but does household chores, such as cleaning, laundry, ironing, taking out the garbage, and hanging pictures, without assistance from anyone. (R. at 82.) She also reported going outside four to five times a week, going shopping for groceries, paying her bills, handle savings, and having hobbies that include watching television, reading, taking walks, and sometimes socializing with friends and family. (R. at 83.) Figueroa noted changes in her activities since her illness, such as watching more television, socializing less, and an inability to handle stress well. (R. at 84, 85.) She also reported being treated for her depression and anxiety every two weeks. (R. at 84, 85.)

On May 15, 2007, Figueroa visited Raritan Bay Mental Healthcare Center and received psychotherapy treatments for depression and anxiety. (R. at 67, 68.)

On July 29, 2008, Figueroa saw her psychiatrist, Dr. Bhatia. (R. at 157.) During her visit, Figueroa complained of "having [a] lot of stressors," not sleeping, and feeling anxious, overwhelmed, and isolated. (R. at 157.) Dr. Bhatia reported that Figueroa was "mildly depressed," with fair concentration and good memory. (R. at 157.) Dr. Bhatia diagnosed Figueroa with a mood disorder (not otherwise specified), polysubstance abuse in remission, and a personality disorder, and prescribed her the antidepressant Cymbalta. (R. at 157.)

On September 3, 2008, during a visit to Dr. Bhatia, Figueroa stated that she was "less depressed" and "less anxious." (R. at 155.) Dr. Bhatia assessed the same disorders as on Figueroa's July 29, 2008 visit. (R. at 155.) On September 30, 2008, Figueroa returned to Dr. Bhatia stating that she was "mildly depressed." (R. at 422.) Dr. Bhatia noted the same disorders as during the previous visits, reporting that Figueroa was "improving" on her medication. (R. at 422.) On October 27, 2008, Figueroa returned to Dr. Bhatia, reporting that she is feeling and sleeping better. (R. at 423.) Dr. Bhatia noted that Figueroa was "stable" and "functioning adequately," once again assessing the same disorders. (R. at 423.)

On January 13, 2009, Dr. Bhatia noted Figueroa mentioned "multiple stressors," including relationship problems with her boyfriend and "financial problems" assessed that Figueroa was "mildly depressed," having fair concentration and self-isolating behavior, but "coping better." (R. at 420.) On April 7, 2009, Figueroa again reporting "stressors," including financial and relationship troubles, as well as "trust issues," but stated that she is "doing better," with improvements in her anxiety levels and depression. (R. at 421.) Dr. Bhatia noted that Figueroa was "mildly anxious" and "much improved." (R. at 421.)

On June 8, 2009, Figueroa reported to Dr. Bhatia that she was "feeling better," has been clean and sober for a "long time" and not depressed, but that she has been isolating herself. (R. at 418.) Dr. Bhatia continued to assess the same disorders as in the past and noted that Figueroa was "dressed neatly" and "maintained good eye contact." (R. at 418.)

In April 2009, Dr. Bhatia noted that Figueroa was "mildly anxious" and "much improved." (R. at 421.) On June 8, 2009, Figueroa reported to Dr. Bhatia that she was "feeling better," has been sober for a "long time" and not depressed, but that she has been isolating

4

herself. (R. at 418.) Dr. Bhatia continued to assess the same disorders as in the past and noted that Figueroa was "dressed neatly" and "maintained good eye contact." (R. at 418.)

On August 5, 2009, Figueroa reported having a better relationship with her boyfriend, sleeping better, and having an "OK" appetite. (R. at 419.) Dr. Bhatia noted that Figueroa has been socializing with people in her building, visiting her family and her boyfriend, and has been stable on her medications. (R. at 419.) Dr. Bhatia assessed dysthymia, polysubstance abuse in remission, and a personality disorder. (R. at 419.) On October 6, 2009, during Figueroa's next visit to Dr. Bhatia, she stated that she was feeling "less anxious," having good appetite, and sleeping better. (R. at 416.) Dr. Bhatia assessed her as "stable" and "not depressed." (R. at 416.) On December 2, 2009, Figueroa reported to Dr. Bhatia that this was a difficult time of the year for her, having broken up with her boyfriend and feeling "mildly anxious" about the breakup. (R. at 417.) Dr. Bhatia continued to note the same disorders, including mood disorder, not otherwise specified, history of polysubstance abuse in remission, and a personality disorder. (R. at 417.)

On January 20, 2010, Figueroa reported that she was back with her boyfriend and has been feeling "stressed and depressed," having made "superficial cuts" on her left wrist that did not require stitches but noted that she was "feeling better" now, denying suicidal ideation. (R. at 415.) Dr. Bhatia noted "good eye contact," "no psychosis," and assessed dysthymia, alcohol and polysubstance abuse in remission, and a personality disorder, but ruled out post-traumatic stress disorder. (R. at 415.) On April 5, 2010, Figueroa returned to Dr. Bhatia, who assessed her as having "no psychosis," being stable on her medication, having dysthymia, a history of polysubstance abuse in remission, and a borderline personality disorder. (R. at 414.) On June 3, 2010, Figueroa reported "doing well," having a better relationship with her boyfriend, and that she stopped drinking and attended church. (R. at 413.) Dr. Bhatia continued to assess the same

5

disorders as in the past, stating that she was "stable." (R. at 413.) On August 10, 2010, Figueroa reported that she was "doing OK," having visited her children, sleeping well, and feeling that she was "getting stronger." (R. at 412.) Figueroa's mood was "stable," she denied suicidal ideation and was stable on her medications, with no side effects. (R. at 412.) Dr. Bhatia assessed the same disorders as in the past. (R. at 412.)

On October 7, 2010, Figueroa reported socializing and that she has been "coping better." (R. at 411.) Dr. Bhatia noted that Figueroa's mood was "stable," and assessed the same disorders as before. (R. at 411.) On December 15, 2010, Figueroa reported to Dr. Bhatia that her insurance was no longer covering her Cymbalta prescription and Dr. Bhatia switched it to Zoloft. (R. at 410.) Dr. Bhatia noted that she appeared "mildly depressed," without psychosis, denying suicidal ideation. (R. at 410.)

*c. The ALJ's Decision*

On December 23, 2005, Figueroa filed an application for supplemental security income, where she alleged disability beginning August 6, 2002. (R. at 16.) On June 29, 2006, Figueroa's application was initially denied, and then on March 19, 2007, was denied again upon reconsideration. (R. at 16, 30-33, 35-39.) On May 10, 2007, Figueroa requested a hearing before an administrative law judge, which was held on September 16, 2008. (R. at 16, 29, 339-357.)

On October 16, 2008, the ALJ issued a decision, which stated that Figueroa "has not been under a disability, as defined in the Social Security Act, since December 23, 2005, the date the application was filed." (R. at 21.) Additionally, the ALJ considered Figueroa's "age, education, work experience, and residual functional capacity ('RFC')," and held that "there are jobs that exist in significant numbers in the national economy that [Figueroa] can perform." (R. at 21.)

6

On June 5, 2009, Figueroa submitted a request for Appeals Council review, which was denied. (R. at 6-8.) On July 22, 2009, Figueroa filed an action in federal district court (Civ. No. 09-3601), and on February 23, 2010, the district court remanded the case. On December 16, 2010, the Appeals Council vacated its final decision and remanded the case to the ALJ. (R. at 375-79.)

On March 23, 2011, a second administrative hearing was held. (R. at 435-64.) On April 13, 2011, the ALJ issued a second decision (referred to herein as the ALJ Decision), which again stated that Figueroa "has not been under a disability, as defined in the Social Security Act, since December 23, 2005, the date the application was filed." (R. at 365-74.) On May 2, 2012, the Appeals Council declined review and the ALJ's Decision became the final decision of the Commissioner. (R. at 357A-357C.)

On June 29, 2012, Figueroa filed the instant matter before this Court. (Compl.) Figueroa "asserts that substantial evidence exists in the administrative record to support a finding of disability," and that "the Commissioner's final administrative decision is not based on the substantial evidence of record." (Pl.'s Br. at 1, 9.)

**LEGAL STANDARD**

This Court exercises plenary review of all legal issues on an appeal of a decision by the Commissioner of Social Security. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). This Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations omitted).

Substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla'; it is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey*, 354 F. App'x. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). However, if the factual record is adequately developed, "'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Daniels v. Astrue*, No. 4:08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "The ALJ's decision may not be set aside merely because [a reviewing court] would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x. 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360). This Court is required to give deference to the ALJ's findings if supported by substantial evidence. *Scott v. Astrue*, 297 F. App'x. 126, 128 (3d Cir. 2008). Nonetheless, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." *Cruz*, 244 F. App'x. at 479 (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)). Indeed, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the

claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984).

**DISCUSSION**

For purposes of SSI benefits, a person is considered disabled if she can demonstrate an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). A medically determinable physical or mental impairment "is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

A claimant will be found disabled "only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. § 423(d)(2)(A). Substantial gainful activity is work that involves significant physical or mental activities and is done for pay or profit. *See* 20 C.F.R. § 416.972(a)-(b) (2012). "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step sequential analysis to determine whether a claimant is disabled as defined under the Act. 20 C.F.R. § 404.1520(a)(1). If a claimant is found to be disabled or not disabled at any of the five steps, the Commissioner does not proceed to the

remaining steps. 20 C.F.R. § 404.1520(a)(4). In the first step, the ALJ considers the claimant's work activity, if any. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in substantial gainful activity, she is not disabled. *Id.* At the second step, the ALJ considers the medical severity of the claimant's impairment or combination of impairments that is expected to result in death, or has lasted or is expected to last for a continuous period of at least 12 months. 20 C.F.R. § 404.1529(a)(4)(ii). If the claimant's impairment does not, then she is not disabled. *Id.* At the third step, the ALJ considers the medical severity of the claimant's impairment or combination thereof. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant has an impairment that meets or equals one of the listings in the Code of Federal Regulations and meets the duration requirement, the claimant will be found disabled. *Id.* If the claimant is not found to be disabled, the ALJ moves to the fourth step, in which the ALJ considers the claimant's RFC and past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is deemed fit to perform his or her past relevant work, the claimant is not disabled. *Id.* Otherwise, the ALJ moves on to the fifth step. At this final step, the burden shifts to the Commissioner to demonstrate, using the claimant's RFC, age, education, and work experience that the claimant can perform other work activities that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If she is incapable, a finding of disability will be entered. *Id.* However, if the claimant can perform other work, she will be found not disabled. *Id.*

*a. Step One*

At step one, if the ALJ determines that plaintiff is engaged in "substantial gainful activity," disability benefits are denied. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)).

10

In this case, the ALJ found that Plaintiff "has not engaged in substantial gainful activity since December 23, 2005." (R. at 370.) Therefore, the ALJ proceeded to the second step.

*b. Step Two*

At step two, the ALJ examines whether the claimant has a medically determinable impairment or combination of impairments that are "severe." 20 C.F.R. § 416.929. The ALJ also considers all symptoms to the extent "they can reasonably be accepted as consistent with the medical evidence, and other evidence." *Id*.

In the instant matter, the ALJ found that Plaintiff "has the following severe impairments: depression, anxiety, and a history of polysubstance abuse (in remission)." (R. at 370.) As a result, the ALJ proceeded to step three of the sequential analysis.

*c. Step Three*

At step three, "the ALJ must compare the claimant's medical evidence to a list of impairments presumed severe enough to negate any gainful work." *Caruso v. Comm'r of Soc. Sec.*, 99 F. Appx. 376, 279 (3d Cir. 2004). If plaintiff's impairments "meet or equal" a listing, plaintiff is considered disabled and will be awarded benefits. *Knepp v. Apfel*, 204 F.3d 78, 85 (3d Cir. 2000).

Here, the ALJ analyzed Plaintiff's mental impairments under the criteria of listings 12.04, 12.06, and 12.09. (R. at 370.) Under section 12.00 of the Listing of Impairments titled, "Mental Disorders," an evaluation of disability "requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on [claimant's] ability to work, and consideration of whether these limitations have lasted or are expected to last for . . . at least 12 months." 20 C.F.R. Pt. 4, Subpt. P, App. 1. Paragraphs B and C of section 12.04 "describe impairment-related functional limitations that are incompatible with

the ability to do any gainful activity" and such limitations "must be the result of the mental disorder described in the diagnostic description." 20 C.F.R. Pt. 4, Subpt. P, App. 1 § 12.00(A).

The ALJ considered whether the paragraph B and C criteria are satisfied. (R. at 370.) To satisfy paragraph B criteria, a mental impairment has to interfere with a claimant's ability to engage in substantial gainful activity. 20 C.F.R. Pt. 4, Subpt. P, App. 1 § 12.04(B). The plaintiff has to demonstrate marked limitations in at least two of the following categories: "activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* "Marked" means the limitation "must be more than moderate but less than extreme." *Id.* at § 12.00(C). Or, if under paragraph C, claimant has a "[m]edically documented history of chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" and claimant experiences "[r]epeated episodes of decompensation, each of extended duration." *Id.* at § 12.04(C)(1).

Here, the ALJ found that "[t]he claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of [the] listings." (R. at 370.) With respect to the B criteria listed in 12.04, the ALJ found that "[i]n activities of daily living, the claimant has mild restriction," moderate difficulties in social functioning, and moderate difficulties "[w]ith regard to concentration, persistence, or pace." (R. at 371.) The ALJ also noted "the claimant has experienced no episodes of decompensation, which have been of extended duration." (R. at 371.) Since the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, ALJ concluded that the "paragraph B" criteria are not satisfied. (R. at 371.) Additionally, the ALJ concluded that "the evidence fails to establish

the presence of the "paragraph C" criteria. (R. at 371.) As a result, the ALJ found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1" to warrant a finding of disability. (R. at 370.)

Next, when a plaintiff's impairment(s) do not meet or equal the listed impairments, the ALJ must assess the claimant's "[RFC] based on all the relevant medical and other evidence in [the plaintiff's] record . . . ." 20 C.F.R. § 416.920(e). When assessing the plaintiff's RFC, the ALJ considers the plaintiff's "ability to meet the physical, mental, sensory, and other requirements of work . . . ." 20 C.F.R. § 404.1545(a)(4). The RFC assessment is then used at the fourth step of the sequential evaluation process to determine if the claimant can perform his or her past relevant work and at the fifth step "to determine if [the claimant] can adjust to other work." 20 C.F.R. § 416.920(e).

1) *The ALJ properly weighed the medical evidence*

Great weight should be accorded to a treating physician's reports, "especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)). However, "[a]n ALJ may reject a treating physician's opinion . . . on the basis of contradictory medical evidence" so long as he provides reasons for his decision. *Id*. (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985)).

In the instant matter, the ALJ found that "the claimant has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to work that can be learned in one month and that involves simple

instructions, and that requires only occasional contact with supervisors, coworkers and the general public." (R. at 371.) In reaching this conclusion, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," including opinion evidence. (R. at 371.)

The ALJ followed a two-step process: 1) the ALJ determined "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and 2) the ALJ "evaluate[d] the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." (R. at 371-72.) If the statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not supported by objective medical evidence, the ALJ must make a finding of credibility of the statements based on a consideration of the record as a whole. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529(b).

Here, the ALJ also considered the medical reports provided by the doctor who examined Plaintiff. (R. at 372.) For example, specifically, the ALJ considered: the 2002 mental health intake records stating that the Plaintiff "was diagnosed with dysthymic disorder and major depression was ruled out"; the 2005 medical records from Middlesex Adult Corrections indicating that the Plaintiff "is dysphoric with mood swings but is capable of managing her emotions and maintaining good behavioral control"; the October 2007 records, when the Plaintiff "was diagnosed with mood disorder and organic psychotic condition depressed type," as well as with "panic disorder without agoraphobia"; the December 2005 transfer summary, which characterized the Plaintiff "as being stabilized and not on medication"; progress notes from 2008 and 2009 indicating good eye contact, neat appearance, diminished or mild anxiety, reports of

feeling better, and being less depressed; the January 2009 progress notes describing the Plaintiff "as self-isolating and mildly depressed." (R. at 372.) The ALJ afforded "[g]reat weight" to Dr. Bhatia's December 15, 2010 report, which indicated that Plaintiff is only mildly depressed, is alert and oriented, presents neatly and with good eye contact, and is coping with stressors, as well as the August 2010 entries indicating that Plaintiff is fully alert and oriented, that her mood is stable and her affect is full, that she is sleeping better and is getting stronger. (R. at 372, 373.) The ALJ "noted that the claimant testified at the hearing to activities of daily living including going out with friends and going to church, and [that] she further testified to not having taken illegal drugs for a number of years." (R. at 373.)

After carefully considering the medical evidence presented, the ALJ found that Plaintiff's "impairments could reasonably be expected to cause the alleged symptoms . . . ." (R. at 372.) However, the ALJ concluded "although the claimant has been treated for depression and has a history of self-mutilation and anxiety, she is nevertheless capable of work involving simple instructions that can be learned in one month, and requiring only occasional contact with supervisor, coworkers, and the general public." (R. at 372.) The ALJ noted that "[a]t no time did Dr. Bhatia indicate that [P]laintiff was a danger to herself or others." (ALJ's Decision at 9.)

    2) *The ALJ evaluated Plaintiff's credibility*

"Allegations of pain and other subjective symptoms must be supported by objective medical evidence." *Hartranft*, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529). Section 404.1529(a) provides that "statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably . . . produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . would lead to a conclusion

that you are disabled." 20 C.F.R. § 404.1529(a). This requires the ALJ to weigh the medical evidence to determine whether the claimant's alleged limitations "can reasonably be accepted as consistent with the medical . . . evidence." *Id.*; *see also Hartranft*, 181 F.3d at 362 ("[T]his obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.").

In addition to the objective medical evidence, the ALJ considers other factors in assessing the individual's subjective symptoms, such as: the claimant's daily activities, the type of medication taken to treat the symptoms and its effectiveness, other treatment a claimant has received for relief of symptoms, and other factors concerning limitations and restrictions due to the alleged symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(i)-(vii). A claimant's complaints of pain should be given "great weight" only when supported by objective medical evidence, but may be disregarded if contrary medical evidence exists. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993) (citations omitted).

In the instant matter, the ALJ took note of the Plaintiff's reported activities of daily living. (ALJ's Decision at 13.) The ALJ noted that the Plaintiff testified going out with her friends, not having trouble completing simple household tasks, fixing her own meals three or four times a week, cleaning, doing laundry, ironing her clothes, taking out the garbage, and hanging pictures, going outside four to five times a week despite her allegations of self-isolating behavior, ability to travel by herself, shopping, handling her bank account, paying bills, and using a checkbook. (R. at 82, 83, 352, 373.) The ALJ also noted Plaintiff's report that her hobbies included taking walks and socializing with friends or family and spending holidays with friends and her boyfriend. (R. at 161, 163.) The ALJ determined that all of the activities described "are inconsistent with the [P]laintiff's allegations of a totally disabling mental

16

disorder." (R. at 372-73.) As a result, the ALJ found that "[P]laintiff's activities and the medical evidence failed to substantiate the existence of totally disabling symptomatology" and proceeded to step four of the sequential analysis. (R. at 373.)

*d. Step Four*

If the ALJ is unable to make a determination at the first three steps of the sequential analysis, at step four the ALJ must determine whether the plaintiff has the RFC to perform her past relevant work experience. 20 C.F.R. § 404.1520(f). If the ALJ finds that plaintiff can still do the kind of work plaintiff previously engaged in, plaintiff is not disabled. *Id*.

Here, the ALJ found that the Plaintiff has no past relevant work. (R. at 373.) The ALJ stated that "[a]lthough the record demonstrates work as a cashier, a temp worker and a housekeeper, none of this work has risen to the level of substantial gainful activity." (R. at 373.) As a result, the ALJ proceeded to step five of the sequential analysis.

*e. Step Five*

In the instant matter, the ALJ determined that the Plaintiff has no past relevant work, at step four. Therefore, the ALJ had to evaluate Plaintiff's ability to adjust to other work by "considering [her] residual functional capacity and [] vocational factors of age, education, and work experience." 20 C.F.R. § 416.960(c)(1). An ALJ must provide evidence demonstrating that a plaintiff can perform other work, which exists in significant numbers. 20 C.F.R. § 416.960(c)(2). If other work exists that the plaintiff can perform, she is not disabled. *Id*.

Here, the ALJ concluded that a significant number of jobs exist in the national economy that Plaintiff is capable of performing. (R. at 373.) The ALJ further explained that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the

national economy" and "[a] finding of "not disabled" is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines." (R. at 374.)

Plaintiff was born on March 24, 1964 and was forty-one years old at the time of the ALJ's Decision. (R. at 373.) The ALJ determined that Plaintiff is considered a "younger individual age 18-49, on the date the application was filed." (R. at 373.) As a result, Plaintiff's age does not seriously affect her ability to adjust to other work. 20 C.F.R. § 404.1563(c). The ALJ also found that Plaintiff "has at least a high school education and is able to communicate in English." (R. at 373.)

The ALJ determined that "[t]ransferability of job skills is not an issue because the claimant does not have past relevant work." (R. at 373.) Given Plaintiff's non-exertional limitations, a vocational expert was asked to testify. Specifically, the ALJ asked the vocational expert, among other things, whether work was available for an individual with the "vocational profile of claimant" whom he assumed could do "light work," but is "limited to work that can be learned in one month or less, and that involves simple instructions, and involves only occasional contact with supervisors, co-workers, and the general public." (R. 460.) The vocational expert testified that an individual with Plaintiff's RFC has the ability to perform requirements of representative occupations such as decal applier, microfilm mounter, bagger, sorter, and sealing machine operator. (R. at 460-461.) Further, the vocational expert testified that there are 45,000 such jobs in the national economy, with 1,500 positions in the northern and middle parts of New Jersey. (R. at 461.) The ALJ then asked a second hypothetical, including the additional limitations of not being able to "concentrate well enough to understand and remember simple instructions," and "unable to work at a steady pace for an eight hour day, and unable to react appropriately to supervision, and to contact with co-workers, and the general public." (R. at

461.) Given these added limitations, the vocational expert opined an individual would not be able to perform those jobs or any other work in the regional or national economy. (R. at 461.) After hearing the testimony of a vocational expert, the ALJ ultimately concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. at 373.) The ALJ found that Figueroa "has not been under a disability, as defined in the Social Security Act, since December 23, 2005, the date the application was filed." (R. at 374.)

Plaintiff argues that the first hypothetical to the vocational expert did not include all of her limitations. However, the hypothetical did include Plaintiff's limitations that were supported by the medical evidence in the record. The ALJ explained that he gave "great weight" to the reports by Plaintiff's treating psychiatrist that noted she was "only mildly depressed," alert, and oriented, with good eye contact and was coping with stressors. (R. 372-73.)

**CONCLUSION**

For the foregoing reasons, the Court finds that substantial evidence in the record supports the ALJ's Decision. Accordingly, the Court **AFFIRMS** the ALJ's Decision.

s/ Susan D. Wigenton, U.S.D.J.

Orig:        Clerk
cc:         Parties